## THE STATE OF IOWA *v.* NASH AND REDOUT.

It was the intention of the legislature, in passing the act entitled "an act to authorize the holding a special term of the district court in the city of Keokuk, Lee county, Iowa, for the purpose of trying criminals," approved March 23, 1858, that a term of the district court should be held for the transaction of criminal business, in contradistinction to a term for the transaction of civil and chancery business.

The word "trial" in the first section of the act to authorize the holding a special term of the district court in the city of Keokuk, Lee county, Iowa, for the purpose of trying criminals, approved March 28, 1858, is used in its general and enlarged sense, and includes as well the finding of an indictment against a criminal, as the proceedings of the court had after the issue has been determined, and a verdict of the jury rendered.

When the legislature gives to a court the power *to try,* it confers every other power necessary and proper for the accomplishment of the object proposed.

In an application for a change of venue in a criminal case, on the ground of excitement and prejudice again the defendant where the offense was committed, the affidavit of the defendant, and three disinterested persons, as required by statute, makes out a *prima facie* case, entitling the defendant to a change of venue; and very strong negative testimony should be produced, to justify the court in overruling the application for a change of venue.

Where in a criminal case, the defendants filed their petition for a change of venue, alleging that such excitement and prejudice existed against them in the county where the offense was committed, that they could not receive a fair and impartial trial, and also filed the affidavit of three disinterested persons, citizens of the county, who stated that the facts set forth in the petition of defendants were true; that to their knowledge, the prejudice against the defendants was very great in that part of the county from which the jurors would be taken; that their lives had repeatedly been threatened; and that they believed a fair trial could not be had: and where the court determined to hear additional testimony in relation to the alleged state of public feeling, and thereupon the defendants filed sundry affidavits, as follows : That of the sheriff of the county, who deposed, that on three several occasions, when, with his assistants, he was taking the defendants from the jail to the office of the justice before whom they were examined, the streets through which they were expected to pass, were crowded with people, and that, thinking that prudence required that he should not conduct the defendants through the said crowd, he took them to the office of the said justice through a back street or alley; that of one S., who deposed that, since the shooting of the deceased, he had heard several persons say that they would each be one of a crowd to hang the defendants on a tree ; that he had heard other

The State of Iowa v. Nash and Redout.

persons say that they should be hung; and that he believed that, on account of the prejudice and excitement against defendants, a fair and impartial trial could not be had;—that of fifteen other persons, who testified that, as they verily believed, such prejudice and excitement existed against defendants in said county, that they could not have a fair and impartial trial;—and that of the attorneys for the defence, six in number, who made oath that they were familiar with the state of public feeling in the county; that they are convinced that, under the state of prejudice and excitement against defendants, no fair trial could be had; that to require them to be tried there would be a practical denial of a fair trial; that their conviction that justice, and a fair administration of the law, required a change of venue, had overcome their reluctance as attorneys to make affidavits; that they had been abused by influential citizens for appearing as counsel for defendants, and had been told that it was a shame that they should lower themselves so much as to defend them; and that they believe that five hundred men in the vicinity partook of this feeling against the defendants; and where the stat· intr·- duced counter affidavits, controverting the existence of such a state of feeling against the defendants, and thereupon the court overruled the application for a change of venue; *Held*, That the court erred in refusing a change of venue.

In trials for felony, the defendant is always allowed to call witnesses to his general character; and where it is shown, in such a case, on an application for a continuance, to enable the defendant to obtain such testimony, that he has had no time to take such testimony since his arrest and imprisonment, and particularly since the finding of the indictment against him, the continuance should be allowed.

Where it is made to appear to the court, from the statement of the prosecuting attorney, that the interests of the public require that a particular one of two defendants, jointly indicted for a felony, and demanding separate trials, should be first tried, the representative of the state has the right to choose which shall first be tried; and the refusal of the court to grant the request of the defendants, cannot be assigned for error.

Where a judgment in a criminal case is reversed, because of the error of the court below in refusing a change of venue, and in refusing to grant a continuance, it does not follow that the defendant, when the case is called for trial anew, in the district court, will be entitled to a change of venue, or to a continuance, on the affidavits or showing heretofore filed. If he still desires a change of venue, or a continuance, he must renew his application, and show that a legal cause for such application still exists.

All that is said and done in the presence of a party charged with a criminal offense, and in relation thereto, is proper evidence to go to the jury, for the purpose of introducing and explaining the conduct of the defendant; and where the party is charged with murder, such evidence

is admissible, whether or not, the deceased was then under the apprehension of death.

In cases of murder, the dying declarations of the deceased, are admissible in evidence, as a part of the *res gestæ*, and in analogy to the cases in which hearsay evidence is admissible.

The admission in evidence of the dying declarations of the deceased, in cases of murder, is not a violation of the tenth section of the first article of the constitution of the state of Iowa, nor of the constitution of the United States.

Dying declarations to show the commission of the offense, and the person by whom the mortal injury was inflicted, can only be given in evidence, where they are made under a sense of impending death; but to render them admissible, it is not necessary to prove, by expressions of the deceased, that he was apprehensive of immediate death, nor that he was *in articulo mortis*.

That the deceased, at the time of making the declarations offered in evidence, was under a sense of impending death, may be shown by the express language of the declarant, or may be inferred from his evident danger, or from the opinion of medical or other attendants, or from his conduct, or other circumstances of the case.

The length of time that elapses between the declarations and the death of the deceased, furnishes no rule for the admission or rejection of the evidence, as dying declarations; nor will a declaration, which is competent evidence when made, be rendered incompetent by a subsequent revival of strength in the dying person.

The bodily or mental feelings of a party charged with crime, where material to be proved, may be shown by his appearance and conduct, when first charged with the offense, and are to be deemed original evidence.

Where on the trial of a party charged with murder, the state proved that on the morning after the commission of the alleged offense, the witness called on the defendant, and told him the police officers were after him; and where the state then asked the witness how the defendant appeared at the time, to which he answered, that defendant turned white, and then laughed, which testimony was objected to, but admitted by the court; *Held*, That the evidence was properly admitted.

Where witnesses, on the taking of their depositions, are interrogated as to their means of knowledge of the reputation of a party for truth and veracity, and instead of answering as to their means of knowledge, they proceed to speak of the character of the associates of the party assailed, and his own general moral character, the answers are not responsive, and may properly be suppressed.

Where two persons are jointly indicted for a criminal offense, and tried separately, the one not upon trial, is not a competent witness for his co-defendant, until he is discharged.

The dying declarations of a person who has been killed, made with regard to the circumstances that caused his death, are to be received with the same degree of credit as other testimony ; and the jury are to judge of their weight, as of all other evidence.

Where it is sought to establish a common design to commit an unlawful act, and to hold all the parties charged, liable for the acts of any one of the company, by evidence of the acts and declarations of one of the alleged conspirators, a foundation must first be laid by proof, sufficient in the opinion of the court, to establish *prima facie*, the fact of conspiracy between the parties, or proper to be laid before the jury, as tending to establish such fact.

When the connection of individuals in an unlawful enterprise is shown, every act and declaration of each member of the confederacy, in pursuance of the original concocted plan, with reference to the common object, is, in contemplation of law, the act and declaration of them all.

In a criminal case, if the whole evidence taken together, produces such a conviction on the minds of the jury, of the guilt of the defendant, as they would act upon in a matter of the highest importance to themselves in a like case, it is their duty to convict.

Where one person unites with one or more other persons in a felonious enterprise, expected to result in homicide, or combines with them to commit an unlawful act, with the resolution to overcome all opposition by force, and is present, aiding and abetting the deed, or is constructively present, by performing his part of the unlawful enterprise, such as keeping watch at a distance, to prevent surprise, or the like, and murder is committed by some one of the party, in pursuance of the original design, or the unlawful act results in death, he guilty as the principal and immediate offender.

## *Appeal from the Lee District Court.*

### Tuesday, December 14.

At a special term of the district court of Lee county, held at Keokuk, in May, 1858, the defendants were indicted for the murder of Thomas A. Harrison.

A motion was made to quash the indictment, for the reason that the same was not found by a legal grand jury; and that the court was not authorized to impannel a grand jury at said special term, which was authorized to be called "for the trial of criminals, and for that purpose alone." The motion was overruled.

A motion for a change of venue by defendants, was also overruled. The ground of the application was the

alleged excitement and prejudice of the people of Lee county against the defendants. The court heard additional testimony by affidavits, filed by both parties; all of which is embodied in a bill of exceptions.

The defendants next moved the court for a continuance of the cause until the next term, to enable them to take testimony in New York and Illinois, to establish their good moral character, and to impeach the character for truth and veracity, of the principal witness for the prosecution against them. The continuance was also asked on account of the prevailing excitement and prejudice against the defendants; by reason of which, they make oath, that they believe they could not have a fair and just trial at Keokuk, at the said special term. The motion for a continuance was overruled.

The defendants having demanded to be tried separately, and the same being directed by the court, they next moved the court, that the defendant, Redout, be first tried; which motion was denied.

Upon the trial, exceptions were taken by the defendants, to the admission of the dying declarations of Harrison; to the exclusion of testimony offered by the defendants; to the instructions given to the jury at the request of the state; to the refusal of those asked by the defendants; and to the overruling the motion for a new trial. All the the other material facts will be found in the opinion of the court.

*Rankin, Miller & Enster* and *J. C. Hall,* for the appellants.

The first error assigned, relates to the overruling the joint motion of the defendants to quash the indictment. The point taken is, that the term of the court at which the indictment was found, was a special term, held by virtue of a law of last session of the legislature; and that by that act, the court could do nothing but try criminal cases, and could not have a grand jury, and find indictments. There

exists no power in the district courts, to appoint special terms, unless they are ordered during the existence of some regular legal term, except for the trial of causes in which both parties consent. Code, section 1569, 1570. The power of the court, then, and the purposes for which it was called, are entirely dependent on the act under which it was called. This act is not ambiguous. It uses terms well defined in the law ; and its language is close, precise, accurate, and well defines its limitations.

It may be as well to consider a moment, what the court called under it, is not, before we seek to determine what it is. It is not, then, a general term of the court, for no civil business can be transacted. It is not a general criminal term, for no language is used which amounts to that. It is called for " a purpose," as said in the preamble ; and its last words are, that it is " for said purpose alone." What is that purpose ? "For the trial of criminals." These are all the words, and as they are very few, and very important, every word must, if possible, have its full weight and influence. The important member of the sentence is the word *trial*. The act, in its body and preamble, says it was called for a " purpose." Now the word purpose relates to some action or thing, in the mind, contemplated to be done. The word purpose relates, then, naturally and forcibly, to the word trial, and the word criminals is used to show what class of cases is to be tried. That there might be no loose construction of the act by the courts, and no extension of the act beyond the one purpose of trying a certain class of cases, it is emphatically added, " and for that purpose alone." The preamble, also, is very clear and very precise, that there was but one thing to be done, but one purpose in view—an act for holding a special term " for the purpose of trying criminals." It is a principle of construction, that every word and phrase in an act, must have its appropriate place, and its full meaning, if possible ; and it is another rule, that where the language is clear, and the meaning of the words well defined, there is noth-

ing to do but to follow their grammatical construction. It is still a third rule, that technical words, must have their technical meaning in the construction of a statute. For these principles of construction, and for the danger of the courts interpolating, extending or modifying, the statute, so as to make it differ from the clear, natural import of the terms, see the following authorities: Sedgwick on Statute and Constitutional Law, 306 to 311; 7 Cranch, 52; 4 Blackford, 150; 5 Porter, (Ind.), 107; Ib., 160; 5 Humphrey, 396; 4 Pick., 402; 9 Porter, (Ala.), 260.

Our Code says, that words and phrases, having a technical, or a peculiar and appropriate meaning in the law, shall be construed according to such peculiar and appropriate meaning. Now, the word *trial*, is a word which, in law, is as technical, and has as well defined and appropriate a meaning, as any word in the English language. The various kinds of trial are enumerated and set forth in all the elementary law writers and law dictionaries. 2 Bouvier's Law Dictionary, 602; Burrill's Law Lexicon, word Trial. None of these meanings can, by any possibility, include within the word trial, the finding of an indictment by the grand jury. Indeed, a trial requires a different kind of jury; consisting of a different number, formed on different principles, and governed by different rules in its action.

It may be said, that the finding an indictment by a grand jury, is a necessary incident to a trial of criminals, and is therefore included in the power of the court. This, however, is not true. A criminal trial may be had on information, or by appeal from a justice's judgment; or a trial may be had at one term, on an indictment found at another. It may be said that this construction defeats the object of the law. But this again is not true. The object of the law, as gathered from its face, and from all reasonable probability, was to have a term for the trial of persons already indicted, or cases of appeal, or on information. The crime for which these parties are indicted, was not committed when the law was passed.

There was in the records of the court, [enough business clearly within the meaning of the law, without getting up new indictments; and such was the purpose of the legislature, as understood and expressed by those who made the law.  Has the court a right to override all these rules of construction, and usurp a power denied it by the law, for the purpose of hastening the death of persons charged with crime?

The law gave the judge authority to hold a term for the trial of criminals, and for that purpose alone.  He holds a court of oyer and terminer—a term for general criminal purposes—in short, a criminal court, at which all the business relating to criminal jurisprudence can be done.  He makes the word trial of no effect in the sentence, and rejects its well settled meaning.

The points made by the same counsel, in which authorities are cited, are as follows:

On the subject of dying declarations, and their admission as evidence in criminal cases, the first point we wish to make, is this:  That it violates that provision of the constitution of the United States, which says that the defendant shall be entitled to be confronted with the witnesses against him.  If this were a new question, we think there could be no doubt it would be held to exclude such testimony, but we are aware that authorities have held the other way.  There are so many questions in this record, that we cannot give this question the consideration it demands, which we regret the less, as we feel sanguine the declarations in this case, should have been ruled out on other grounds.

*Secondly:*  There was not such grounds laid for the admission of the declarations, as the law requires.  Greenleaf, with that wonderful accuracy and power of condensation for which he is so conspicuous, lays down the rule, in section 158:  " It is essential to the admissibility of these declarations, and is a preliminary fact to be proved by the party offering them in evidence, that they were made un-

der a sense of impending death." Again: "It is the impression of almost immediate dissolution, and not the rapid succession of death in point of fact, that renders the testimony admissible." "If there was any expectation or hope of recovery, however slight it may have been," they are inadmissible.

There are two things necessary, then, to the admission of this class of declarations: 1. The entire absence of all hope of recovery; and 2. The impression of almost immediate dissolution. The authorities are full and clear on this point. *Rex* v. *VanButchell*, 14 E. Com. Law, 495; *Rex* v. *Thomas*, 19 Ib., 518; *Rex* v. *Shillsbury*, 32 Ib., 566; *Rex* v. *Mary Fagent*, 32 Ib., 590; *Regina* v. *Megson et al.*, 38 Ib., 249. These authorities sustain to the fullest extent, the language of Greenleaf, and the two propositions laid down by us. If the old English authorities are so restrictive in the circumstances under which this exception to the rule of hearsay evidence is admitted, how far should American courts be from extending it, when we look to the principle on the subject in our federal constitution.

The next error to which we propose to attend, is the action of the court in striking out a part of the depositions. The most important witness for the prosecution was one Charles Keisor. Defendants took depositions in Warsaw, Illinois, under an order of the court, to impeach his character. In the cross-examination, the counsel for the state asked certain questions, which they had a right to do, and received answers which were not satisfactory, and which, on their motion, the court excluded from the jury. It will be seen that the answers are emphatically responsive to the questions. It is urged that the testimony so given, is irrelevant, and should be excluded. We take the rule, however, to be that on a cross-examination, the party may ask a variety of collateral and irrelevant questions, but if the answers do not suit him, he cannot then exclude them from the jury. This rule is well settled. 1 Greenleaf, sections 448, 449, and notes to the last section. The case of the

*Commonwealth* v. *Buggell*, 16 Pick., 157, is directly in point. In taking depositions, the case is considered as if the witnesses were on the stand. If the testimony was irrelevant, they brought it out, and the court gave sufficient instructions as to the rule of impeachment, to guard the jury against any improper impression.

The next error which we propose to examine arises from this : the defendants severed, and had separate trials. On the trial, each offered to introduce the other as a witness, to testify to facts important to the defense. The court refused to permit either of them to testify, on the ground that, being jointly indicted with the defendant on trial, the person offered was an incompetent witness. There is no question but that the rule at common law excluded such persons. Let us, however, examine for a moment the principle on which it was excluded. The first case on the subject, in this country, is that of *The People* v. *Bill*, 10 Johns., 95, and that is based upon a decision of Lord Ellenborough, the reason for which cannot be very satisfactory to any one. This case has been followed by others, in all which it is laid down as a technical rule of law, on the ground of the witness being a party to the record, and because it is against public policy, but not on the ground of interest.

In some of the cases cited, it will be seen that it is expressly said, that they could not be excluded on the ground of interest in the event of the suit. The rule itself has been found very unsatisfactory to the true legal mind, and in Georgia, the court refused to follow it, and several of the states have expressly abolished it, as in Virginia; and others, including our own, have abolished it, with other disqualifications of witnesses. See *Commonwealth* v. *Marsh*, 10 Pick., 57; 2 Gray, 592; 10 Grattan, 716; 15 Missouri, 60.

Such being the common law, our Code has very clearly abolished the rule, and rendered such witnesses competent. See sections 2388 to 2393, inclusive. These provisions of

The State of. Iowa v. Nash and Redout.

the Code evidently intended to change the law, for they say that circumstances, which have heretofore excluded a witness, may be given as to his credibility. It also, in express terms applies, both to civil and criminal cases. Now, if the alteration does not include this case, what does it include. There can be no pretence that, on separate trials, either party had a direct, certain, and legal interest in the event of the other's trial. If not, there is no other disability, in this case, at least, which is not removed by the Code. These parties do not come within any of the exceptions which the Code provides to its specific clause, in section 2388.

The next error is the exception to instructions given at the instance of the state. The first point of these is, that the court charged the jury, that " dying declarations were to be received with the same degree of credit as other testimony." Now, when the court charges a jury as to the " degree of credit" they will give any testimony, it departs from its function. We can construe the term " degree of credit," as having no other meaning than "weight of testimony," in the sense here used. But, admitting that the court had a right to instruct on that subject at all, its instructions are erroneous. Dying declarations, instead of being entitled to the same degree of credit as other testimony, is of the weakest character, and its reception at all, is of doubtful policy ; and, so far from charging in that form, the court should have told the jury that it was wanting in some of the most essential elements of strong testimony, and if it charged on that subject at all, should have said it was to be received with strong suspicion, and was not entitled to equal weight with other testimony. 1 Greenleaf, section 162 ; 6 C. & P., 160.

II.  The court charged that if there was proof sufficient to establish, *prima facie*, a criminal design to commit a burglary, all were responsible. Now, the common design, where you wish to affect a party not present at the criminal act, must, like any other fact essential to the prisoner's

guilt, be established to the satisfaction of the jury, beyond a reasonable doubt. *Prima facie* means, at the first blush —on its first face. "As it first appears," is probably the best definition, certainly the one a jury would most readily adopt. 2 Bouvier's Dictionary, *prima facie.*

. The court charged, " that it was the duty of the jury to convict, if the evidence produced such a conviction of the prisoner's guilt, as they would act on in a matter of the highest concern and importance to themselves." And the same qualification is affixed to the charge on the subject of reasonable doubt, asked by defendant's counsel. This is both false and misleading. There can be no such like case, in which a man is called on to act in his own affairs. The nearest. that we can imagine is, if a man charged with murder should seek to marry the juror's daughter. Does the court mean that the jury must convict the prisoner, or refuse him his daughter, on the same amount of mental conviction of his guilt? If the instruction means anything, it means just that. It is an attempt to fritter away the doctrine of reasonable doubt, and have the jury convict on a bare preponderance of evidence, for, in the highest concerns of a man's life, as in his religion, his marriage, his heaviest pecuniary transactions, he often does, and sometimes must act on a balance of probabilities—on the preponderance of testimony. The court having already charged that Redout might be guilty, although absent, if a previous common design to commit a burglary was proven, this instruction cannot be true, if that one is.

The court, throughout its charge, has assumed that if a *prima facie* case of a preconcerted scheme to commit a burglary, is made out by the commonwealth, that both prisoners are guilty, without reference to their presence or absence, of murder in the first degree. The statute, in dividing murder into two degrees, has made a very material alteration in the elements of the law of murder; and the general presumption, that a homicide is murder, is now held only to be murder in the second degree. 12 Georgia,

144; 10 Humphrey, 103; 2 Grattan, 594. The court, in its charges, has made no reference to this distinction—has nowhere stated to the jury, the distinctions between the various grades of murder—but by refusing or modifying certain instructions asked by defendant's counsel, has substantially left the jury to infer that the prisoners, if guilty at all, must be so in the first degree. This is error. See 10 Georgia, 146. It will be seen that in the present case, and indeed in the Nash case, the absence, or presence, of the parties, is held of no account. If Redout was two or three hundred yards off, attending a public meeting, as the proof showed, and Nash, or the person who did the shooting, did not do so in pursuance of the original plan to steal out of a store house, then Redout was not guilty of the murder; or, if guilty at all, certainly only in the second degree.

It is the intent— premeditated intent—which constitutes the high crime in its first degree, and here there could have been no such intent on the part of Redout. The scheme did not go that far, and that result of it, he had no participation in, nor did he give his consent to it. For this principle, we refer to the following authorities: 3 Greenl. Ev., 138; 1 Bishop Crim. Law, 265; 4 C. & Payne, 565; or 9 Eng. Com. Law, 529; 6 Ib., 396; 25 Eng. Com. Law, 455; 9 Ib., 309; 38 Eng. Com. Law, 189; 4 Porter, (Ala.) 403.

*S. A. Rice*, (Atty. General), and *Turner & Craig*, for the State.

The first error alleged is, that the court below erred in overruling the motion of the defendants, to quash the indictment, because it was found and presented by the grand jury, at the special May term, at which, it is contended, no such business as the finding of indictments could be legally transacted.

By chapter 134 of the laws of 1858, it was made the duty of the judge of the first judicial district, to hold a

term of the district court at such time as he might deem expedient, between the first of April and the first of July, of the present year, " for the trial of criminals, and for that purpose alone."

The word criminals, must be interpreted to mean persons charged with crime. Every statute must receive a reasonable construction; and when words have no signification, ar a very absurd one, if taken in their literal acceptation, then it is necessary to deviate from the common sense of the words, and construe them in such a manner as will result in a rational and consistent meaning. 1 Swift's Digest, 12. If the meaning of a statute be doubtful, the courts will seek for the meaning of the legislature by looking at the occasion and necessity of the law, and the object had in view. 2 Michigan, 486; 4 Comst., 140. And they will take into consideration extrinsic facts and circumstances for the purpose of ascertaining the intention of the legislature. Thus they would consider the situation of the country at the time the law was passed. 2 Cranch, 358; 7 Cranch, 52; 1 Wheat., 115; 3 Scam., 160 and 609; 17 Vermont, 479. The legislature postponed the spring term on account of the financial condition of the country. This was done for reasons which did not apply to criminal business; but, on the contrary, the spirit of our institutions, the express language of the law of the land, and justice to the public and to individuals, all require that persons charged with offenses should have a speedy trial. Without a special criminal term, many persons charged with crime, from the lowest to the highest grade, would have lain, perhaps, in prison, from the adjournment of the grand jury, in tee fall of 1857, to the sitting of the court in the fall of 1858, with, perhaps, not enough of evidence against them to warrant the grand jury to find an indictment; and, besides, the administration of justice in civil matters would have been embarrassed and delayed by an unusual amount of business being thus crowded into the fall term. It must be evident that this was the necessity

which this special enactment was designed to meet.  The
end in view was, that the administration of public justice
in criminal matters, might go on without interruption;
that without delay the penalties of the law might be en-
forced, the guilty punished, and the innocent set at liberty.

This being the manifest intention of the legislature, the
next question is, will the language of the law itself reason-
ably bear a construction which will give effect to this in-
tention, and meet the object of the enactment?  This is
not a penal statute.  Penal statutes are those which define
offenses; which specify particular acts, and designate them
as crimes, and they are to be strictly construed, because
the courts should not pronounce any act a crime, which is
not clearly and positively made so by the express words of
the enactment. 19 Conn. 292.,  But this is a statute in re-
lation to the administration of public justice, and should
be liberally construed for the attainment of that object  .1
Gill, 66.  A strict construction adheres precisely to the
words and letter of the law—a liberal construction carries
the meaning of the law giver  into more complete effect,
than a strict and confined exposition would allow.

The judge is authorized to hold "a term of the
district court."  A grand jury is a necessary part of a court
with criminal jurisdiction—made so by the constitution.
There was a grand jury already existing at the time
the act was passed, and which would continue to be
the grand jury for that part of Lee county, during the time
contemplated in the act for holding the term.  The term
was to be held "for the trial of criminals, and for that pur-
pose alone."  The word "criminals," (meaning persons
charged with crime), is not connected with any word or
clause of limitation, but is used in its general extension.
If it was designed by the legislature to include only those
who had already been indicted at the September term, A.
D. 1857, it is strange that it is used without limitation or
qualification.

It is contended by the counsel for the defendants, that

the word "trial" is to be confined to its strict technical sense —the determination of the issue raised by the plea to the indictment; and that the term was to be held for this purpose alone. To this it is answered, that in the interpretation of statutes which relate to the administration of public justice, the courts will give a more complete effect to the evident intention of the legislature, than a strict and technical exposition would allow ; and that if the power granted by the act is to be strictly and literally confined to the decision on the plea by a jury, then not only the finding and presentment of indictments, but the decisions of motions to quash, motions for a new trial, and in arrest of judgment, and the passing of sentence, are all unauthorized. By virtue of the established principles of criminal jurisprudence, and the requirements of constitutional law, there are certain inseparable antecedents, incidents, and consequents, connected with every criminal trial; and the power to try carries with it by just and reasonable construction, the power to do what is always done, and what the law of the land requires to be done, in our criminal courts preparatory to, and subsequent to, the trial. The legislature intended that the judge in the trial of criminals, should proceed according to the forms and requirements of the established law of the land ; that he should call together the grand jury then organized; have men indicted according to the constitution ; decide all preliminary motions ; and after verdict grant a new trial, arrest judgment, or pass sentence ; and not that his power should be confined to the trial in the strict sense contended for by the defendant's counsel, and to that alone. If this is the true sense in which we are to understand the words, "for the trial of criminals," then the following clause, "and for this purpose alone," was simply intended to confine the business of the term to criminal cases, to the exclusion of all matters of a civil nature. It is submitted that this is the true and reasonable interpretation of the act; and that it best effects the intent of the legislature, and promotes the administration of justice. The

court is referred to chapter 19, section 3, of the Laws of 1858, as an evidence of the intention of the legislature in passing the act under consideration; and because the two acts are *in pari materia.* The word "trying" in the one, means precisely what the word "trial" does in the other, and there can be no doubt but that the words "for the purpose of trying the criminal cases now pending in said court, or which may hereafter be commenced therein," were intended to mean the entire procedure of criminal cases through a court of justice.

The argument founded on the distinction between offenses committed before the date of the passage of the act, and those committed after, is unsound. The distinction itself is idle, gratuitous, and does not rest on any just reason. Besides it yields the strict and technical interpretation of the act, admits the construction contended for above, and grants that, under the law, the judge has power to call the grand jury together, to indict for offenses prior to the date of the enactment. And if the act contemplated that the grand jury should meet and inquire in and for the bodies of the townships of Jackson, &c., there is not only no intimation in the act that their inquiry should be confined to offenses prior to its passage, but no consideration, founded either in reason or in justice, can be adduced why it should be.

Upon the other points made, the counsel for the state cited authorities:

1. A continuance may be granted, at the discretion of the court. Wharton's Crim. Law, 940, note 7; Ib., 942, note 6; 8 Smedes & M., 414; 1 Greenleaf, 65; 2 Starkie, 214; Roscoe Crim. Ev., 89.

2. The prosecution has the right to elect who shall be tried first, in cases of severance of persons jointly indicted. Whart. Crim. Law, 211, sec. 433; 1 Kelly, 610.

3. A co-defendant is not a competent witness, in case of separate trials, until discharged. 1 Greenleaf Ev., sec. 362, 363, n. 4; Ib., 379, 407; 2 Russell on Crimes, 969; Whart. Crim. Law, sec. 790; Code, sec. 2994.

4. The dying declarations of the deceased are admissible in evidence. 1 Greenleaf Ev., secs. 156, 261 ; Whart. Crim. Law, secs. 669, 771 ; 2 Russ. on Crimes, 753, 763 ; 1 Parker's Crim. Rep., 13 ; Ib., 299 ; 3 Leigh., 786 ; 2 Grattan, 594 ; 6 C. & P., 157 ; Ib., 386 ; 9 C. & P., 395 ; 2 Pike, 229 ; 2 Ashmead, 41 ; 1 Meigs, 265 ; 1 Speers, 57 ; 1 Hawks, 442 ; 7 Humph., 542 ; 8 S. & M., 401 ; 13 Missouri, 381 ; 11 Ired., 513 ; 13 Ib., 184 ; 16 Ala., 672 ; 17 Ib., 587 ; 2 Chand., 172 ; 11 Geor., 353 ; 1 Jones Law, N. C., 251.

5. The instructions on the part of the state were correct. 1 Phill. on Ev., 282 ; *Rex* v. *Foster*, 6 C. & P., 325 ; 3 Cow. & H. notes to Phill. on Ev., 255, n. 188 ; Ib., 256, n. 190 ; 1 Greenleaf Ev., section 160 ; 13 Missouri, 382 ; 1 Stark. Ev., 578 ; 13 S. & M., 210 ; 23 Miss. (Cush.) 322; 5 Cushing, 296 ; 3 Gilm., 661 ; Whart. Crim. Law, 327 ; 4 Barr, 270 ; 1 Greenleaf Ev., sec. 111 ; Wharton, 324 ; 3 Archb. Crim. Plead., 619, 621, and note; 2 Russel on Crimes, 698 ; 3 Greenleaf Ev., 92, 94.

6. The instructions asked for by the defence were properly modified or refused. 3 Greenleaf Ev., section 138 ; Wharton Crim. Law, secs. 734–39 ; 3 Gilm., 368 ; Code, section 2928. *Commonwealth* v. *Webster*, 5 Cushing, 296.

STOCKTON, J.—I. There was no error in the refusal of the court to quash the indictment. The act of assembly authorized and directed a special term of the district court of Lee county, to be held at Keokuk, " for the trial of criminals, and for that purpose alone." Session acts, 1858, chap. 134, 259.

The point made by the defendants is, that by the terms of this act, no authority was given to the district court, at said special term, to summon a grand jury for the finding of indictments against persons charged with crime; and that its powers were confined to the trial, simply of criminals already indicted, or whose cases might otherwise come before it. It may be conceded that the purposes for which the special term was authorized, as well as the pow-

ers of the court when convened, are to be determined from the language and meaning of the act of assembly referred to, without, at the same time, conceding the conclusions sought to be drawn from it by the defendants.

Without inquiring into the reasons, or motives, which may have induced the legislature to pass the act directing the holding of the special term at Keokuk, we are clear that the intention of that body was, that the term should be held for the transaction of criminal business, in contradistinction to a term for the transaction of civil and chancery business. It is true, that the language used would bear a different construction, by giving to the word "trial," the more narrow and restricted meaning in which it is sometimes used to express the investigation and decision of facts only. This is not, however, the more natural and obvious sense in which it is used in this instance. In its more general and enlarged sense, the word is used to signify all that is to be done in a cause, from its inception to its termination, or until final judgment is pronounced. In this sense, the word includes, as well the finding of the indictment against a criminal, as the proceedings of the court had after the issue has been determined, and a verdict of the jury rendered. If we confine its meaning to the limits sought to be fixed for it by the counsel for defendants, then the business of the district court, at the special term, would have been limited to the decision of issues in fact, in criminal cases, and it would have had as little power to pronounce judgment after verdict, as to summon a grand jury for the finding of indictments.

In further illustration of the views of the court, it may be remarked, that by the Code, section 1569, a special term of the district court may be ordered in any county, at any regular term of the court in that county; and the court ordering such special term, shall direct whether or not a grand jury shall be summoned. We cannot conclude that any such difference was contemplated between the powers of the district court, at the special term directed to be held. by the act of assembly, and at which the defendants

were tried, and a special term ordered as provided by section 1569, as that a grand jury would be lawful and regular at the one, and not at the other also. The authority by which they are called, is the same, and it is but fair to assume that, so far as relates to summoning a grand jury, the powers of each are the same. The special term was not one authorized to be called for the trial of those criminals only who might consent to be tried. When the legislature gave the power *to try*, it gave every other power necessary and proper for the accomplishment of the object proposed. It did not stipulate for the consent of the persons to be tried.

In *United States* v. *Hill & Co.*, 1 Brockenbrough, 156, on a motion to quash a presentment made by a grand jury, it was urged that no act of congress directs grand juries, or defines their powers; and the question was asked, by what authority are they summoned, and whence do they derive their powers? "The answer is, (says MARSHALL, C. J.), that the laws of the United States have erected courts which are invested with criminal jurisdiction. This jurisdiction they are bound to exercise, and it can only be exercised through the instrumentality of grand juries. They are, therefore, given by a necessary and indispensable implication. But how far is this implication necessary and indispensable? The answer is obvious. Its necessity is co-extensive with that jurisdiction to which it is essential. Grand juries are accessories to the criminal jurisdiction of a court, and they have power to act, and are bound to act, so far as they can aid that jurisdiction. Thus far the power is implied, and is as legitimate as if expressly given."

II. The defendants next filed their petition for a change of venue, setting forth that such excitement and prejudice against them existed in Lee county, that they could not receive a fair and impartial trial. They filed also, as required by the statute, the affidavit of three disinterested persons, citizens of Lee county, who made oath that the facts stated in the defendants' petition, were true, and that to

their knowledge, the prejudice against the defendants was very great in that part of Lee county, from which the jurors would be taken; that their lives had repeatedly been threatened; and that they believed a fair trial could not be had in the city of Keokuk, in Lee county.

The court determined to hear additional testimony, in relation to the alleged state of public feeling and prejudice against the defendants. There was, accordingly, filed on the part of the defense, the affidavit of W. H. Leech, the sheriff of Lee county, to the effect that on three several occasions, when, with his assistants, he was taking the defendants from the jail to the office of the justice, before whom they were examined, the streets through which they were expected to pass were crowded with people; and, thinking that prudence required that he should not conduct the defendants through the said crowd, he took them to the office of said justice, through a back street, or alley. The affidavit of S. J. N. Smith was also filed, who deposed that since the shooting of Harrison, he had heard several persons in Keokuk, say, that they would each be one of a crowd to hang defendants on a tree; that he had heard other persons say that they should be hung; and that he believes that, on account of the excitement and prejudice against defendants in Lee county, a fair and impartial trial could not be had. Fifteen other persons make oath that, as they verily believe, such prejudice and excitement exist against defendants, in said county of Lee, that they could not have a fair and impartial trial.

In addition to these affidavits, the attorneys employed in the defence, six in number, make oath that they are familiar with the state of public feeling in the city of Keokuk, and the region of country from which the trial jury must be taken; that they are convinced that, under the state of prejudice and excitement against defendants, no fair trial could be had; that to require them to be tried at Keokuk, at the said special term in June, would be a practical denial of a fair trial; that their conviction that justice and a fair administration of the law required a change of

venue, had overcome their reluctance as attorneys to make affidavits ; and that they had been abused by influential citizens for appearing as counsel for defendants, and had been told it was a shame that they should lower themselves so much as to defend them.   They further state that they believe that five hundred men in Keokuk and vicinity partake of this great feeling against defendants.

On the part of the state, counter affidavits from some twenty-one persons were filed.   H. W. Sample and nine others, state that they have reason to know and believe that there was no such excitement and prejudice in the community as would, in the least, interfere or prevent the defendants from having a fair and impartial trial, at the hands of a jury in the city of Keokuk.   To the same purport is the affidavit of G. B. Smith, and others.   The affidavit of G. W. Saunders, and others, states that they discovered nothing like undue excitement towards the defendants, or either of them, and have heard nothing that would tend to convince them that they could not have a fair and impartial trial.   The state filed also the affidavit of H. R. Reeder, the justice of the peace before whom the defendants were examined, who states that he believes that, at the time of said application, there was no such excitement or prejudice in the community against the defendants, as, in anywise, to prevent them from having a fair and impartial trial in the city of Keokuk.

The district court overruled the motion for a change of venue ; and this is the second error assigned by the defendants.

The act of January 29th, 1857, (session acts, ch. 227, 389), provides no change of venue shall be granted on the ground of alleged excitement and prejudice of the people, unless the facts constituting the ground of the application are sworn to by three disinterested persons, in addition to the applicant.   It is further provided that the court, in its discretion, may hear additional testimony from the parties, by affidavit and otherwise, and being fully advised, shall

decide the application according to the very right of the matter. If the application is overruled, and the defendant demand it, the court shall grant a bill of exceptions, embracing all the evidence produced before the court on the hearing of the application.

Previous to the passage of this act, the facility with which changes of venue were obtained, had become the crying reproach of our system of criminal procedure. Such were the flimsy pretexts on which they were sought, and the light and insufficient grounds on which they were awarded, that the public sentiment of the state had settled down in the conviction, that persons charged with crime resorted to the expedient of a change of venue, in order to get out of the reach of prosecutor and witnesses against them, and thus avoid a just responsibility for their acts, and for the purpose of avoiding, rather than seeking, a fair trial. To remedy this evil, and to prevent the delay and hindrance of justice, the legislature wisely, as we think, have required that three disinterested persons shall make oath to the facts constituting the grounds of the defendant's application for a change of venue.

The question for the decision of the district court, in this instance, was, whether a case had been made out, authorizing the court to grant to the defendants a change of venue; or, in other words, whether from the affidavits filed, the court might well have concluded that such excitement and prejudice against the defendants existed in the minds of the people of Lee county, as to render it probable that they could not have a fair and impartial trial in that county.

We can come to no other conclusion, than that the application of the defendants for a change of venue was made in good faith. Taking the affidavit of the defendants, and that of the three persons required by the statute, in addition, we think the district court should have found ample reasons for awarding the change of venue. A *prima facie* case was certainly made out, going to show, that if defendants were tried at the special term of the district court in June, the strong probabilities were, that, owing to the pre-

judice and excitement against them in Lee county, and particularly in Keokuk, and the townships from which the trial jury was summoned, they would not have received a fair and impartial trial.

Was this aspect of the case changed by the affidavits subsequently filed? . In the very nature of things, the affidavits filed on the part of the state, and the testimony furnished by them, of the state of feeling against the defendants, must be of a negative character. However respectable the affiants, and however well informed they might be, it was hardly to be expected that their means of knowledge should be such as to establish a negative, in opposition to the sworn affirmative testimony of an equal number of men, for aught we can know, quite as respectable, and with equal means of knowledge. They may depose with perfect propriety, and in the utmost good faith, that they believe that no such feeling exists in the community as to prevent an impartial trial. Still, that excitement and prejudice against the defendants may have existed, without being known to them, which would have prevented such impartial trial.

There is nothing in the counter affidavit, filed by the state, tending to impeach, in any degree, the good faith of the application on the part of the defendants, or to render less probable the facts alleged as the reason why the change of venue should have been granted. Giving due weight to these affidavits, and to the facts stated by the affiants as the basis of the belief entertained by them, we are still of the opinion that the defendants were entitled to a change of venue.

Harrison is shown to have died from the effects of his wound, on the 13th of April. The application for a change of venue was made to the district court, on the 28th of May succeeding. At the time of the commission of the offense, it is conclusively shown, that great excitement existed amongst the people of Keokuk, on account of the murder. Great interest was taken to secure the discovery and arrest of the perpetrators of the crime. When the defendants

The State of Iowa v. Nash and Redout.

were taken into custody, this excitement was increased by the many rumors put afloat as to the evidence that could be produced against them. When brought before the justice of the peace for examination, great crowds of persons followed them, and filled the court-room, manifesting much feeling and excitement. And so many threats were made, and such a determination exhibited to hang the prisoners, that their attorneys, fearing an outbreak of violent feeling, induced them to waive an examination before the justice on the charge against them. This was the state of feeling against the defendants, only a few weeks before the cause was called on for trial. The feeling may not have extended to all the community, and we suppose it did not. A majority, even, may have been anxious that defendants should have a fair and impartial trial. The excitement may, in a great measure, have passed away before the day of trial. Extremes of passion are often as sudden in their subsidence as in their origin. But the very fact that such excitement has existed, and has manifested itself in such a manner, admonishes us that only the same occasion was required, to produce a renewal of the same exhibition of feeling.

The right to a speedy and public trial by an impartial jury, is guaranteed by the constitution of the state, to all persons accused of crime. It becomes us not to place a light estimate upon a right secured to us by such high authority. It is important to maintain the usefulness of our whole judicial system, that no suspicion of influence from popular excitement, in the administration of the law, should be allowed to impair the public confidence in the fairness and impartiality of judicial proceedings. An excited state of public feeling and opinion, is always the most unfavorable for the investigation of truth. Not only should the mind of the juror be wholly without bias and prejudice—it should not only be free from all undue feeling and excitement in itself—but it should be, as far as possible, removed from the influence of prejudice and feeling, and excitement in others. A circumstance of small

importance in itself, may often, in the midst of a community stirred by passion and excitement, serve to turn the scales of justice.

It is a difficult matter for a court, in all cases, to draw the true line of distinction, and to say when there is, and when there is not, such a state of popular feeling and prejudice as to prevent a fair and impartial trial. Every case must be judged by its own circumstances. It might not be impossible, under almost any state of excitement, to select an unbiased jury, who would so far regard their duty and their oaths, as to desire to return only such a verdict as should be authorized by the law and the evidence. There is, however, to be guarded against, a feeling and prejudice not only within, but without the jury box; and a jury, however right their intentions, are not always proof against the sympathies of the crowd. The influence of popular excitement and prejudice is too strong for the strongest resolution.

In the determination of the question, we give great weight to the sworn statement of the attorneys for the defense—more, perhaps, than was given to it by the district court. The gentlemen who felt themselves impelled by a sense of justice to their clients, and by the influences surrounding their cause, to come forward and make affidavit that, in their belief, justice and a fair administration of the law, required a change of venue, are not unknown to this court, as they were not, we must assume, to the court below. They must be presumed to have been possessed of all the facts bearing on the question of the importance and necessity of a change of venue to the accused; and our knowledge of these gentlemen, forbids us for a moment to suppose, that, in order to obtain the desired change of venue, they would forfeit their honor and professional reputation—and much less, that they would stain their conscience by making oath to facts, that they did not both know and believe to be true.

Upon a careful examination of the evidence before the district court, on which the application for a change of

venue was decided, we think there was error in the refusal of the motion.

III.   Upon the overruling of the motion for a change of venue, the defendants moved the court for a continuance of the cause until the next term.   The motion was overruled; and this is the third error assigned.   We think the motion for a continuance, should have been granted. Aside from the excited state of the public mind, by reason of which, the defendants make oath, they believe they could not obtain a fair and impartial trial at said special term, it is shown that since their arrest and imprisonment, and particularly since the finding of the indictment against them, they had had no time to take testimony which they were advised was material for their defense.

It is shown that defendants were comparative strangers in Keokuk—one of them having resided there about six months, and the other something less than a year.   They asked a continuance to enable them to take testimony in Illinois and New York, to prove that, before their coming to Keokuk, their general character for integrity and uprightness had been unexceptionable.   We think this testimony was allowable, and a continuance should have been granted, to enable defendants to obtain it.   In trials for felony, and in some instances for misdemeanors, the prisoner is always allowed to call witnesses to his general character; and in every case of doubt, proof of good character will be entitled to great weight.   It is a circumstance always to be submitted to the consideration of the jury, together with the other facts of the case.   Roscoe's Crim. Ev., 72.

IV.   The defendants demanded to be tried separately, and moved the court that the defendant, Redout, be first tried.   The motion was based on the affidavit of the defendants, that they believed that no such case would be made out against said Redout, as would leave any doubt of his innocence of the charge; and if acquitted, he would be an important witness for defendant, Nash, to establish

his innocence. The prosecuting attorney insisted that, in his opinion, the public interest required that the defendant, Nash, should be tried first, and refused to consent that Redout should be first tried. The court directed that defendants be tried separately, but overruled the motion that Redout be tried first.

We think there was no error in this ruling of the court. Where it is made to appear to the court, from the statement of the prosecuting attorney, that the interests of the public require, that a particular one, of the two defendants demanding separate trials, should be first tried, we think that, as the representative of the state, he has the right to choose which shall first be tried; and, in such circumstances, the refusal of the court to grant the request of the defendants, cannot be assigned for error. *Commonwealth* v. *Marsh*, 10 Pick., 57; *The People* v. *Bill*, 10 Johns., 95; *The State* v. *Calvin*, R. M. Charlton, 151.

Thus far, the proceedings in the district court were against the defendants jointly. They were tried separately, and each convicted of murder in the first degree. For the error of the court in refusing the change of venue, and in overruling the motion for a continuance, the judgment, in each case, will be reversed, and the cause remanded for a new trial as to each defendant.

It will not follow, however, that either of the defendants, when the cause is called for trial anew in the district court, upon the affidavits heretofore filed by them, will be entitled to a change of venue to some other county. The prejudice and excitement against the accused, in the minds of the people, may have passed away, and the cause alleged for such change of venue, may then no longer exist. The defendants may not still desire a change of venue; if they do, they must renew their application for it, and show that such a state of things exists at the time, as still to call for a change of venue. And so with regard to the continuance. It cannot, when the cause is again in the district court, be ordered on the affidavits heretofore filed.

V.   Other questions, important in the future determina-
tion of the cause, were decided by the district court, and
have been discussed in this court—and we now proceed to
consider them.   The defendants were tried separately;
but as the questions raised on the separate trials, are very
nearly identical, they will be considered in the same opin-
ion.   We first consider those questions so far as they refer
to the case of the defendant, Nash.

The fourth assignment of error, is upon the ruling of
the court admitting certain declarations of Harrison, made
in the presence of the accused, to be given in evidence to
prove that Nash was the person who shot him.   It is prov-
ed that Harrison was shot about ten o'clock at night, on
Friday, the 2d of April, 1858.   Nash and Redout were ar-
rested soon afterwards.

The prosecution having given evidence as to the state of
mind and physical condition of Harrison at the time, pro-
posed to prove by L. W. Huston, that the defendant, Nash,
was taken by him, as a public officer, into the presence of
Harrison, on Sunday night, about forty-eight hours after
the injury was inflicted ; and to prove further the statement
of the deceased on that occasion, that the defendant was
the person who shot him.   This evidence was objected to
by the defendant; the objection was overruled by the
court, and the evidence permitted to go to the jury.

The state next introduced W. H. Leech, and proposed
to prove by him, that on Saturday evening, April 10th, be-
tween five and six o'clock, P. M., the deceased made cer-
tain statements tending to identify Nash as the person who
shot him; Nash then being present before him.   Objec-
tion was made to this testimony by the defendant.   The
objection was overruled, and the evidence allowed to go to
the jury.

The witness, Leech, then testified, that on the day men-
tioned, he took the defendant, Nash, before Harrison, and
told him it was very important to the accused, that he
should be positive, and asked him if he could recognize

the man who shot him, if he was in the room.   He said he thought he could.   Several persons were then placed in front of him, among them the witness and Nash.   Harrison looked at Nash very steadily for some minutes, and then said, pointing to him:   "He is the man that shot me."   The witness then asked him, if he had any doubts, repeating to him its importance to the accused; and asked him if he was certain Nash was the man.   He said there was no doubt; but suggested to the witness to take Nash and put on him a black cloak.   This was done; the room was darkened, and a candle lighted, and Nash was brought before him again.   He took the candle in his hand, and directed the position in which Nash should be placed, and the adjustment of the cap upon his head.   When this was done, he said, pointing his finger to Nash:   "I recollect you now, distinctly; you look now just as you did the night you shot me."   Nash said—"you are mistaken, sir." Harrison replied:   "I am not mistaken—you know it, and you know that I know it.   It was a mean, dirty, shabby trick.   I know you to be the man.   I would be the last man to accuse you, or any other man, under such circumstances."   He then proposed that the accused should stand erect; and directed him to go through the motion, as if he was going to shoot him then.   Nash did so, and repeated the motion, until the deceased expressed himself satisfied.

The testimony of these witnesses relates to occurrences and declarations of the deceased, at a time when Nash was present.   All that was said or done in Nash's presence, was proper to go to the jury, for the purpose of introducing and explaining the conduct of Nash; and this, irrespective of the fact that the deceased was then under the apprehension of death.   1 Starkie's Ev., 64; 1 Greenl. Ev., sec. 156.

The effect to be given to the declarations of Harrison, made at the time, and whether the same were competent to prove the fact of the commision of the offense by the

accused, is a different question, and will be considered by us in connection with the testimony offered to be given as the dying declarations of the deceased, as detailed by the witness, Day.

The prosecution offered to prove, by Benjamin G. Day, that Harrison, on the Saturday morning before the Tuesday on which he died, made certain declarations, which were offered to be given in evidence as his dying declarations, in order to connect the defendant, Nash, with the shooting, from the effects of which he died. This testimony was objected to, as was that of the witnesses, Huston and Leech, but the objections were overruled, and the evidence was suffered to be given to the jury.

The first point made by defendant is, that the admission of the evidence of the dying declarations of Harrison, violates that provision of the constitution, which declares that "in all criminal prosecutions, the accused shall have the right to be confronted with the witnesses against him." Constitution of U. S., amendments, article 6; Constitution of Iowa, article 1, section 10. We think the objection is not well taken. Such evidence is received, as being analagous to the cases in which hearsay evidence is admissible, as being part of the *res gestœ*. Roscoe Crim. Ev., 23 ; *McLean* v. *The State*, 16 Alabama, 672 ; *Nelson* v. *The State*, 7 Humph., 542. The point was made in Tennessee, where the bill of rights declared that in criminal cases the accused should have "the right to meet the witness face to face." It was held, that this provision was not violated by the admission of the dying declarations of one deceased. *Anthony* v. *The State*, 1 Meigs, 265. In Mississippi, the bill of rights declares, that "the accused shall be confronted with the witnesses against him." It was held in that state, that this provision did not abrogate the rule of the common law, under which, evidence of dying declarations is admitted. *Woodsides* v. *The State*, 2 How., 655 ; 1 Greenleaf Ev., sec. 156, note. The same point was ruled in North Carolina, where the bill of rights contained a similar provision. *State* v. *Tilghman*, 11 Iredell, 513.

And, in Georgia, it was held that the admission of such testimony did not contravene the sixth article of the amendments to the constitution of the United States, which provides, that "in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him. *Campbell* v. *The State*, 11 Ga., 353.

It is in the second place objected, that no such facts were proved, as the law requires to be first shown, as the ground on which the evidence is to be admitted.   The rule is well settled, that dying declarations, to show the fact itself, and the person by whom the mortal injury was inflicted, can only be given in evidence where they are made under a sense of impending death.   1 Greenleaf Ev., sec. 158 ; Roscoe Crim. Ev., 25 ; 2 Starkie Ev., 262 ; 2 Russell on Crimes, 684.   It must appear that they were made by the person injured, in the full belief that he should not recover.   *Dunn* v. *The State*, 2 Pike, 229.   He must be conscious of the peril of his situation, and believe that his death is impending.   *Nelson* v. *The State*, 7 Humph., 542 ; *Montgomery* v. *The State*, 11 Ohio, 424 ; *The State* v. *Cameron*, 2 Chand., (Wisconsin), 172 ; *Hill's Case*, 2 Grattan, 594.   It must satisfactorily appear, that at the time of making them, the deceased was conscious of his danger, and had given up all hopes of recovery.   *The People* v. *Green*, 2 Parker Cr., 11.   It is not necessary to prove, by expressions of the deceased, that he is apprehensive of immediate death, if it appears that he does not expect to survive the injury.   *Rex* v. *Bonner*, 6 C. & P., 386 ; *Darm* v. *The State*, 2 Pike, 229.   Nor is it necessary that the person be *in articulo mortis*, if he be under an apprehension of impending death.   *The State* v. *Tilghman*, 11 Iredell, 513.

We first inquire whether the declarations made by the deceased on Sunday, at the time that Nash was first brought before him, and about forty-eight hours after the infliction of the injury, were properly admitted to go before the jury as evidence, to show that Nash was the person who shot Harrison.

The State of Iowa v. Nash and Redout.

There was evidence to show, that at the time of the injury, Harrison thought he could not recover—that he thought he was shot through the heart, and would not live but a short time. When the physicians were examining the wound, he told them he thought it was of no use. He expressed to the Rev. Mr. Reffe, his spiritual adviser, his belief that he should not survive. The surgeons, however, on examining his wound, did not think that the ball had entered the cavity of the chest, and so told him. They thought the policy was to remove from his mind the impression that he could not recover. And although Harrison thought the physicians were trying to deceive him, and did not seem to believe them when they attempted to encourage him, yet Doctor Haynes thought they partially succeeded.

On Saturday, the next day after he was shot, Mr. Day heard him say, that at one time he had had some hope ; but that he then thought he should die. From this time until the evening of the Sunday when Nash was taken before him, and when the declarations given in evidence were made, it is not distinctly shown what was the state of mind of the deceased, as to his condition. There is nothing, in addition to the evidence referred to above, to show that, on the Sunday evening when the declarations were made, the deceased was not without some hope of recovery. It must, in some manner, be shown, that the impression of impending death existed at the time the declarations were made.

The prosecution, we think, had not laid the necessary foundation to entitle the declarations of the deceased, made on Sunday evening, the 4th of April, to be given in evidence to the jury, as his dying declarations. Being made in the presence of Nash, they may be given in evidence to show what he said or did, when charged with the crime ; or, to show any feeling or passion exhibited by him at the time. But it is not permitted to give the declarations to the jury as evidence that Nash was the person who shot the deceased, without first showing, that, at the time they were

made, Harrison was conscious of the peril of his situation, and believed that his death was impending. As to the declarations of the deceased, made to the witness, Leech, on Saturday, the 19th of April, when Nash was taken before him the second time, we think the court properly admitted them to be given to the jury as his dying declarations.

It is enough, (says Mr. Greenleaf,) if it satisfactorily appears, in any mode, that the declarations were made under a sense of impending death; it may be proved by the express language of the declarant, or be inferred from his evident danger, or from the opinions of medical, or other attendants, stated to him, or from his conduct, or other circumstances of the case; all of which are resorted to in order to ascertain the state of the declarant's mind. 1 Greenleaf Ev., section 158. It is shown, that on the morning of the day when the declarations were made, the medical gentlemen attending upon Harrison held a consultation as to his condition. Dr. Haynes, who had attended him from the first, says, that after this consultation, the deceased was without any hope of recovery. He was a member of the Roman Catholic church. On Friday, the 9th of April, the Rev. Mr. Reffe received his confession, and administered to him the last rites of his church—extreme unction. On the morning of the 10th, he spoke to Mr. Day concerning his business affairs—of the disposition of his property, and of the provision he wished made for his wife, after his death. He returned his thanks to his friends for their kindness to him in his sickness, and took his final leave of them, and of his wife. These circumstances have been held sufficient to show that the party did not expect to survive the injury, and to authorize his declarations to be given in evidence.

The points made by the defence are, that at the time these declarations were made, the evidence showed that the deceased entertained hopes of recovery; and that it did not show that they were made under an impression of almost immediate dissolution. Reliance is placed upon the fact, that the attending physicians at no time told Harrison

that they thought he would die, or that they thought his case was hopeless.    Upon his remark to Dr. Marsh, on the 7th or 8th of April, that he was " not entirely discouraged, but fearful "—upon his concurrence of opinion, expressed to Mr. Gray on the 4th or 5th of April, when told that great hopes were entertained of his recovery—upon the fact that the physicians, until the last two or three days, tried all they could to encourage him to believe that he would recover—and that Dr. Haynes says that he thought they partially succeeded, and that three or four days after the injury, they seem to have inspired him with a little hope.

To this, it may be replied, that whatever presumption might be raised from this testimony, if it stood alone, it cannot overcome the conclusion to be drawn from the other evidence, tending to show the impression of mind of deceased as to his condition, on the Saturday before he died, when Nash was brought into his presence by the witness Leech.    Of the first importance, in connection with this testimony, we place the fact, that the consultation of the physicians, as to the condition of the deceased, was held on the morning of this day, and that Dr. Haynes states, that from the time of this consultation, the deceased was without hope of recovery.

On the other point made, we remark, as before, that it is not necessary to be shown, that at the time the declarations are made, the deceased was under the apprehension of immediate dissolution, or that he should have been *in articulo mortis*.    It is sufficient, if he believes his death is impending and certain.    The length of time that elapsed between the declaration and the death of the declarant, furnishes no rule for the admission or rejection of the evidence.    1 Greenleaf Ev., section 158.    Nor will a declaration, which is competent evidence when made, be rendered incompetent by a subsequent revival of strength in the dying person.    *The State* v. *Tilghman*, 11 Iredell, 513 ; *Johnson* v. *The State*, 17 Ala., 618.

The only remaining question made concerning the declarations of the deceased, relates to what was stated by him to the witness, Day, on the Saturday morning before his death. As it is shown that at this time, the deceased had made his confession, and received extreme unction from the priest; as the declaration was made at a time when he was regulating his worldly affairs, and providing for his wife after his death; when he had taken leave of her, and of his friends, expressing to them his gratitude for their kindness and attention to him during his sickness, and when he had evidently given up all hopes of recovery, we think the declarations were properly received in evidence.

VI. The sixth assignment of error is to the admission by the court, of the evidence as to the appearance and conduct of Nash, when told by the witness, Kaiser, that the officers were inquiring for him. The witness stated that he called on Nash, the next morning after Harrison was shot, and told him the police officers were inquiring for him. The counsel for the state asked the witness how Nash appeared at the time; to which he replied, he turned white, and then laughed. The admission of this testimony was objected to by the defendant, and the objection overruled.

We think there was no error in permitting the evidence to be given to the jury. The bodily or mental feelings of an individual, where material to be proved, may be shown by the usual expression of such feelings, made at the time in question, and are to be deemed original evidence. 1 Greenl. Ev., section 102.

VII. Certain depositions were taken by the defendant, to impeach the character for truth and veracity of Charles Kaiser, witness for the state. On motion, the court suppressed the answers made by some of the witnesses to the third cross-interrogatory. The suppression of these answers, is the seventh error assigned. The answers, in our opinion, were properly suppressed. They were not responsive to the questions. The witnesses were interroga-

ted as to their means of knowledge of the reputation of Kaiser for truth and veracity ; and instead of speaking to their means of knowledge, they proceed to speak of the character of the associates of Kaiser, and his own general moral character.

VIII. The eighth assignment of error is in relation to the refusal of the court, to receive the testimony offered through James Nash. As the objection made by defendants, seems to have been abandoned by the counsel in the argument, it is sufficient for us to say, that we think there was no error in the ruling of the court rejecting the testimony offered.

IX. The defendants were allowed to be tried separately. On the trial of Nash, he undertook to introduce Redout as a witness, to prove facts deemed important to his defense. The court refused to permit him to be sworn as a witness, and this is the ninth error assigned. We think there was no error in this ruling of the court. *The State* v. *Mooney*, 1 Yerger, 431 ; *The State* v. *Calvin*, 1 Charlton 151 ; *The State* v. *Smith*, 2 Iredell, 402 ; *The People* v. *Bill*, 10 Johns., 95 ; *Campbell* v. *The Commonwealth*, 2 Virginia Cas., 314 ; *The People* v. *William*, 19 Wend., 377.

The statute has provided that where two or more persons are included in the same indictment, and the court is of opinion that in regard to a particular defendant, there is not sufficient evidence to put him on his defense, an order may be made that he be discharged from the indictment, before the evidence is closed, that he may be a witness for his co-defendant. Code, section 2994. This would leave little reason to doubt, that it was the intention that one jointly charged with the same offense, should not be a witness for his co-defendant, until he is so discharged.

X. At the request of the state, the court charged the jury, that they were " to judge dying declarations as they do other evidence," and that the dying declarations of a person who has been killed, made with regard to the circumstances that caused his death, are to be received with

the same degree of credit as other testimony. Objection is made to this instruction, that the court departed from its functions, by directing the jury as to the weight of the testimony. We do not understand the court as expressing any opinion as to the weight of the testimony. The dying declarations of Harrison having been given in evidence, the jury were to judge of their weight as of all other evidence. *McDaniel* v. *The State*, 8 S. & M. 401. The person whose declarations are thus admitted, must be considered as standing in the same situation as if he were sworn. 1 Greenleaf's Evidence, section 157. His testimony with regard to the circumstances that caused his death, is to be received with the same degree of credit as the testimony of the deceased would have been, had he been examined on oath. *Green* v. *The State*, 13 Missouri, 382.

It is not to be understood, however, that the defendant may not enter into particulars of the state of mind of the deceased, at the time the declarations were made, and of his behavior in his last moments; or that it may not be shown that the deceased was not of such a character as was likely to be impressed with a religious sense of his approaching dissolution. Roscoe Crim. Ev., 27 28; 1 Philips Ev., 226; 1 Greenl., Ev., sec. 162.

The eighth instruction given by the court, at the request of the state, was as to the admissibility of evidence of the acts and declarations of one of two or more conspirators, to establish a common design to commit an unlawful act, and as to the liability of all for the acts of any one of the company, done in pursuance of the original plan, and with reference to the common object.

It is not shown by the evidence, how this instruction was material or pertinent to the case of Nash. The law, in its application to the subject is, we think, correctly laid down by Mr. Greenleaf: that a foundation must first be laid, by proof, sufficient in the opinion of the court, to establish *prima facie*, the fact of conspiracy between the parties, or proper to be laid before the jury as tending to

establish such fact. The connection of the individuals in the unlawful enterprise, being thus shown, every act and declaration of each member of the confederacy, in pursuance of the original concocted plan, with reference to the common object is, in contemplation cf the law, the act and declaration of them all. 1 Greenl. Ev., sec. 111; 3 Ib., 92—94; Wharton's Crim. Law, Book 2, ch. 2, sec. 6.

The tenth instruction asked by the state and given by the court was, that "if the whole evidence taken together, produced such a conviction on the minds of the jury, of the guilt of the prisoner, as they would act upon in a matter of the highest importance to themselves, in a like case, it was their duty to convict." We think this instruction of the court, was not liable to the objection taken to it by the defendant, and was proper under the circumstances to be given.

We believe that this comprises all the material instructions in the case of Nash, to which our attention has been called.

In the case of Redout, several instructions were given by the court, and several asked by the defendant, were modified and changed by the court; all of which bore on the question of the liability of Redout, for the acts of Nash, in killing Harrison, if he was believed by the jury to have been killed in the perpetration of a burglary previously concocted and agreed upon between Nash and Redout, although Redout was not actually present at the time of the killing. Without setting out these instructions in detail, it is sufficient for us to say, that the law on this subject, as we understand it, is correctly laid down by Mr. Greenleaf; and if Redout was actually present, aiding or abetting the deed, or if he was constructively present, by performing his part in an unlawful and felonious enterprise, expected to result in homicide, such as keeping watch at a distance, to prevent surprise, or the like, and the murder was committed by some other of the party, in the pursuance of the original design, or if he combined with Nash to commit an

unlawful act, with the resolution to overcome all opposition by force, and it resulted in the murder of Harrison, he is guilty as the principal and immediate offender. 3 Greenl. Ev., 138.

The error assigned upon the overruling of the motion for a new trial, it is not necessary for us to consider at this time, as the judgment of the court as to each of the defendants will be reversed, for the reasons stated, and a new trial awarded in each case.

Judgment reversed.